## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROBERT R. MOORE,
        Plaintiff,

v.                                            Civil Action No. 3:07CV2
                                                       (Bailey)

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant") denying the plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on the parties' cross Motions for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Plaintiff Robert R. Moore ("Plaintiff") protectively filed his application for DIB on January 19, 2005, alleging disability since March 9, 2004, due to diabetes, back impairment, headaches, vision problems, and "white lung" (R. 53, 68). The claim was denied at the initial and reconsideration levels of review (R. 32, 33). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on March 10, 2006 (R. 198). Plaintiff, who was represented by a non-attorney benefits representative, appeared and testified on his own behalf, along with Vocational Expert Larry Bell ("VE"). On May 15, 2006, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of decision (R. 26). The Appeals Council denied Plaintiff's request for review, making the

ALJ's decision the final decision of the Commissioner (R.6).

## II. FACTS

Robert R. Moore ("Plaintiff") was born on September 26, 1959, and was 46 years old at the time of the ALJ's decision (R. 202). He finished the 9th grade in school and subsequently obtained his GED (R. 202). He has past relevant work as a furnace operator then as a bobcat operator/truck loader at a zinc plant for 25 years (R. 209).

On May 1, 2000, Plaintiff presented to the emergency room with complaints of left hip pain since a fall from a bobcat at work the previous Monday (R. 161). X-rays indicated "deformity of the pubic symphysis with diastasis pubis, suggesting an old injury" (R. 159). There was no definite acute fracture seen and the left hip appeared intact. He was diagnosed with hip strain/contusion (R. 162).

On November 2, 2000, Neurologist James D. Weinstein, M.D. wrote a letter to Plaintiff's orthopedist, stating as follows:

> Mr. Moore is a 41-year-old man who works at the Zinc plant near Shinnston. He hurt his back falling off a Bobcat on the 24th of April, although he continued to work. At first he had some intermittent symptoms, but these are getting progressively worse down his left hip and into his left lower extremity.
>
> The patient's job involves tugging and pulling at four or five hundred pound barrels which he may do for a whole afternoon.
>
> I reviewed your patient's CT scan. He has a central disc protrusion moving to the left side, but it is not overt. I would like to see either an MRI or perhaps even better a lumbar myelogram/CT scan to see if there is any L-5 nerve root compression. The pathology is probably moderate and the patient probably could get along with this without any further consideration of surgery except that his work is severely stressful to his back and I think that's what's giving him the difficulty. I am going to give him some exercises, but in the long run it may be that he can't do that work whether or not he has surgery.

(R. 192).

On December 4, 2000, Plaintiff underwent an MRI of the lumbar spine which revealed a herniation of L5-S1 on the right, in a position to impinge on the right S1 nerve root (R. 195). Dr. Weinstein opined that Plaintiff needed surgery if his symptoms were persisting.

On February 6, 2001, Plaintiff underwent lumbar laminotomy and discectomy, L5-S1 on the right (R. 177). Plaintiff appeared to be doing well after his surgery.

On August 21, 2001, Plaintiff presented to his doctor for elevated glucose levels with accompanying symptoms (R. 169). He was diagnosed with new onset diabetes mellitus (R. 170). He was discharged with instructions to follow a low-fat, low- sugar diet and with an appointment to see a specialist.

On October 8, 2001, Dr. Weinstein wrote:

> Robert Moore comes back to see me with some right sciatica. I reviewed his operative note and I didn't find as much as I expected to find when I did his surgery. For whatever reasons, he got better, but then was hauling some 500 lb. rolls of fibers and he did something to his back again and has recurrent right sciatica symptoms.
>
> On examination the reflexes are non localizing and decreased. Straight leg raising is not overtly positive.
>
> I am going to get another MRI to see what might be going on.

(R. 188).

On October 29, 2001, Plaintiff underwent an MRI of the lumbar spine which indicated a moderate sized disc protrusion at the level of the lumbosacral interspace with neural compression on the right (R. 193-194).

On November 8, 2001, Dr. Weinstein wrote:

> Robert Moore got another MRI. The report indicates a disc

> protrusion at L5-S1 on the right. I am not so sure that this isn't made up of scar tissue, but in any case the patient is miserable with his condition which developed after he was pulling on 500 lb. fibers. He is so bad that I think it is worth doing another exploration because even if it doesn't help it shouldn't make him any worse.

(R. 187).

Plaintiff underwent a second laminectomy on January 7, 2002 (R. 180).

On May 13, 2002, Dr. Weinstein wrote:

> The patient is gradually improving with physical therapy. I will evaluate him again in another two months. Hopefully, he will continue to improve and perhaps consider returning to work.

(R. 184).

On July 29, 2002, Dr. Weinstein wrote:

> The patient is gradually improving. I think in due course he should be able to return to work. But, right, now, he continues to rehabilitate himself.

(R. 183).

On November 14, 2002, Dr. Weinstein wrote:

> At this time the patient has some modest residual symptoms and I am recommending that he be evaluated for a permanent partial disability.

(R. 182). This November 2002 record is the last record in the transcript until October 13, 2004. Plaintiff filed his application in January 2005, alleging disability since March 9, 2004, when he stated he stopped working (R. 68). He alleged disability due to "Problems with back, diabetes, vision, headaches and white lung." The application indicates he had not seen any doctor, hospital or clinic for the conditions (R. 70). The application indicates he was not taking any medications. He had not had, and was not scheduled to have any tests performed.

Plaintiff stated he had right lower back and leg pain continuously (R. 74). He said he could

4

not "do anything in excess because of the pain." He said he began taking Tylenol in March 1999, and was taking two every four hours. He also alleged "white lung" causing difficulty breathing, and pain in his right shoulder, for which he took Aleve. He also alleged his diabetes caused loss of vision, body functions and mental problems.

On October 13, 2004, Plaintiff underwent a shoulder x-ray which showed no evidence of fracture, and normal bones, joints and soft tissue (R. 172).

Again, Plaintiff filed his application on January 19, 2005, alleging disability since March 2004.

On March 21, 2005, Plaintiff presented to Physician's Assistant Larry Fitzwater for complaints of fluctuating sugar levels and back pain (R. 120). Plaintiff reported he had taken pills and insulin for five years, and was controlling his blood sugar with diet and exercise, but "[n]ow his back hurts and he can't exercise." PA Fitzwater diagnosed diabetes mellitus.

On April 28, 2005, Plaintiff underwent an x-ray of the chest and lumbar spine (R. 126). His chest x-rays were normal. His lumbar spine x-rays showed no narrowing or interspaces; no compression fracture; and slight osteoarthritic changes (R. 126). The diagnosis was osteoarthritic changes of the lumbar spine.

On May 6, 2005, more than a year after his alleged onset date, Plaintiff followed up with PA Fitzwater for his diabetes and complaints of "back pain for three weeks" (R. 119). His blood sugar was fine taking only half a pill. The PA noted, "He recently applied for disability due to back pain." The diagnosis was diabetes. Plaintiff was prescribed one Motrin 800 every six hours for pain.

On June 8, 2005, Plaintiff underwent an examination by Cathy Comerci, D.O., at the request of the State agency (R. 121). Plaintiff's chief complaint was chronic back pain and weakness, "white

5

lung" with shortness of breath with any exertion, diabetes, headaches, and vision problems. Plaintiff reported that he had a work-related injury in 1998 when he fell off a Bobcat. He said he experienced a ruptured disc. He had back surgery in 1999 and again in 2001. He continued to have low back pain, right side worse than left, and worse over the past three weeks. He had radiation of pain from his back into his right hip down to his knee. The back of his knee stayed numb. The right leg buckled, but he had no recent falls. He said he could not sit or stand for a long period of time due to back pain. The pain was worse with bending, stooping, sitting, lifting, carrying, and standing. He also had right shoulder pain for one year, since a 4-wheeler accident. He also reported a history of diabetes; shortness of breath on and off for the past five years; headaches for the past two or three weeks; and blurriness of the left eye with no recent eye exam. Plaintiff reported he had had a pelvic fracture at age 15 from a motorcycle accident. He also had a plate placed in his left arm at age 30.

Upon examination, Dr. Comerci found Plaintiff ambulated with a normal gait, which was not unsteady, lurching or unpredictable (R. 123). He did not require an assistive device. He appeared stable at station and comfortable supine and sitting. He was 6'1" and weighed 235 pounds. His vision was 20/70 right and 20/30 left without glasses. Lungs were clear, with no wheezes, rales or rhonchi. Breath sounds were symmetrical and there was no accessory muscle recruitment, chest tenderness, shortness of breath, or clubbing or cyanosis noted. Plaintiff's shoulders, elbows and wrists were nontender, with no redness, warmth, swelling or nodules. Abduction of the right arm was decreased secondary to pain.

Examination of the dorsolumbar spine revealed decreased lumbar lordosis (R. 124). There was evidence of thoracic muscle spasm. There was no tenderness to percussion of the spine. Straight leg raises were normal sitting and positive at 50 degrees bilaterally supine. Plaintiff could

not stand on one leg. Plaintiff said he could not bend forward at the waist or bend laterally at the lumbar spine due to back pain. There was no hip joint tenderness, redness, warmth, swelling or crepitus. He stated he was unable to toe or heel walk or squat due to back pain.

Dr. Comerci summarized her findings as follows:

> The claimant reported low back pain with previous disk surgery. He also reported radiculopathy in the right lower extremity and weakness. Straight leg test was negative for radiculopathy in the seated position and positive in the lying position, but at 60 degrees and it was the same on the right and left side. There was range of motion abnormalities of the lumbar spine, as noted above. The patellar deep tendon reflexes were brisk and equal bilaterally. Sensory and motor modality appear to be well preserved. There appears to be no evidence of weakness or nerve root compression. Grip strength during examination appeared equal and fine manipulation was well preserved bilaterally. The claimant reported right shoulder pain and there was decreased range of motion of the right shoulder, including being able to bring the arm behind the back. There was some crepitus and pain noted at the right shoulder. The claimant may have a rotator cuff tear. There are no studies available to determine if this is true. If there is a rotator cuff tear it may be repairable. The claimant also reported diabetes mellitus. At this time, there does not appear to be any evidence of retinopathy, nephropathy, or neuropathy, by history. The patient does not report end-organ failure due to the diabetes mellitus. He does report just recently starting a medication to control the diabetes. The claimant also reported shortness of breath with any exertion. The pulmonary examination is normal. The claimant was not short of breath with mild exertion or in the supine position. There is no clubbing or cyanosis. Pulmonary functioning test today revealed mild COPD. The claimant also reported headaches. There were no focal neurologic deficits noted during today's exam.

On June 17, 2005, State agency reviewing physician Pascasio Porfirio completed a physical Residual Functional Capacity Assessment ("RFC") opining that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday (R. 131). He had no postural, visual or communicative

7

limitations. He would, however, be limited in reaching in all directions (R. 133). He should also avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, dusts, gases, poor ventilation, etc., and hazards (R. 134). Dr. Porfirio opined that Plaintiff was only partially credible.

Plaintiff underwent a ventilatory function test on June 17, 2005, which indicated mild COPD (R. 127).

On September 20, 2005, Plaintiff requested that Workers' Compensation reopen his claim for his April 2000 back injury (R. 155).

On September 21, 2005, Plaintiff underwent an MRI of the right shoulder, which indicated a complete tear and retraction of the supraspinatus with moderate-to-severe degenerative change of the AC joint with inferior osteophytes which appeared to be impinging on the superior aspect of the rotator cuff area (R. 156).

On November 22, 2005, Plaintiff presented to Dr. Paul Davis for the first time, to become established as a patient and for assistance reopening his 2000 Worker's Compensation claim regarding his back injury (R. 152). He was also applying for Social Security Disability. He reported he fell off a Bobcat at work in 1999 or 2000 and had back surgery twice. He said he developed significant vision loss in 1999 from diabetes. Worker's Compensation followed him until he settled with them. He said he had seen a Dr. Post in Morgantown after a motorcycle accident injured his rotator cuff, but reported that Dr. Post said he would not perform shoulder surgery until the back problem was resolved. Plaintiff said he slept only 4-5 hours a night. When he walked he felt like he had a basketball in his right lower back. He had taken multiple pain medications in the past. He had been on Xanax after his daughter was molested six years earlier at age 13, and had had a hard time getting off the medication. He smoked ½ pack a day but was trying to stop. He gained weight,

going from 240 to 263 and was concerned that stopping smoking might cause weight gain.

Upon examination, Plaintiff's gait was normal. He had reduced range of motion of the right shoulder. Dr. Davis completed a form for Worker's Compensation that same day stating that Plaintiff had Failed Back Syndrome, Post-laminectomy (R. 153). He noted that Plaintiff complained of increased stabbing and burning pain starting three months earlier, in the right lower back radiating down the back of his leg. The radiating pain was intermittent and aggravated by activity. He was taking Tylenol 3. Dr. Davis believed Plaintiff would take physical therapy if approved. He needed an MRI to assess Plaintiff's back.

Plaintiff complained of difficulty sitting for an entire 15 minute appointment. Dr. Davis stated that Plaintiff did not exhibit drug-seeking behavior. He walked with a significant limp. He had decreased sensation in the right leg and decreased Achilles reflex on the right compared to the left. Straight leg raising was positive on the right at 45 degrees. He had decreased strength on the right and tenderness with radiating pain on palpation over the right side of the LS spine.

Dr. Davis stated that Plaintiff could not continue working at his job while undergoing treatment, but that he could return to light duty with no prolonged standing or sitting, and no bending, squatting or lifting. The undersigned notes that Plaintiff had not worked since March 2004.

On November 24, 2005, Workers' Compensation notified Plaintiff that his April 2000 back injury claim would not be reopened unless additional medical evidence was submitted within thirty days to indicate a worsening or aggravation of the condition caused by the compensable injury.

Worker's Compensation reopened Plaintiff's back injury claim shortly after Dr. Davis submitted his report (R. 151).

On December 12, 2005, Plaintiff told Dr. Davis he was taking Tylenol 3 and had tried

9

Ultracet, both without relief (R. 151). Dr. Davis also referred Plaintiff for a new MRI.

On December 23, 2005, State agency reviewing physician Cynthia Osborne completed an RFC, finding that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday (R. 140). He had no postural, manipulative, visual, communicative or environmental limitations. Dr. Osborne found as follows:

> Claimant with h/o back injury and c/o pain. PE without significant findings and has been under treatment with h/o surgery. Also with c/o COPD but continues to smoke and has h/o DM. Indicates need for ADL assistance but need not supported by MER. Complaints are partially credible. Decrease RFC to medium.

On December 28, 2005, Workers' Compensation approved Plaintiff's physician's request for an MRI, adding: "If it is later determined you are not entitled to authorized services, payment will be recovered."

Plaintiff underwent a lumbar MRI January 4, 2006 (R. 148). The "Impression" was:

> Multilevel degenerative changes. No significant extruded disc fragment or stenosis. There is some foraminal encroachment on the right L5-S1 moderately encroaching on the exiting right L5 nerve root as described. Clinical correlation for that nerve root distribution recommended.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act so as to be insured for benefits throughout the period at issue herein, i.e., since March 9, 2004.

2. The claimant has not engaged in substantial gainful activity during the period at issue (20 CFR §§ 404.1526(b) and 404.1571 *et seq.*).

3. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: mild osteoarthritis and residual effects, status post February 2001 and January 2002 lumbar laminectomies; history of supraspinatus tendon tear, right shoulder; mild chronic obstructive pulmonary disease, with continued tobacco abuse; Type II diabetes mellitus; (20 CFR § 404.1520(c).

4. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 VFR §§ 404.1520(d), 404.1525 and 404.1526).

5. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform within a controlled environment a range of work activity that: requires no more than a light level of physical exertion; requires no lifting of more than 10 pounds with the dominant (right) arm/hand; requires no overhead work with the dominant (right) arm/hand; affords opportunity for brief, one-to two-minute changes of position at least every half-hour; entails no exposure to significant workplace hazards (e.g., dangerous moving machinery, unprotected heights, etc.); requires no climbing of ladders, ramps ropes, scaffolds or stairs; requires no more than occasional balancing, crawling, crouching, kneeling or stooping; entails no concentrated exposure to extremes of humidity, hot or cold temperatures or respiratory irritants (e.g. dust, fumes, gases, noxious odors, smoke, etc.);and accommodates up to one unscheduled workday absence per month (20 CFR § 404.1520(c)).

6. Through the period at issue, the claimant has lacked the ability to fully perform the requirements of any vocationally relevant past work (20 CFR §404.1565).

7. The claimant throughout the period at issue is appropriately considered for decision purposes as a "younger individual" (20 CFR § 404.1563)

8. The claimant has attained the equivalent of a "high school" education and is able to communicate in English (20 CFR § 404.1564).

11

9. The claimant has acquired no particular work skills that are transferable to any job that has remained within his residual functional capacity to perform during the period at issue (20 CFR § 404.1568).

10. Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, he has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since March 9, 2004 (20 CFR § 404.1520(g)).

(R. 17-26).

## IV. DISCUSSION
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

The ALJ's credibility/pain evaluation is fatally infirm as he fails to state logical reasons or cite substantial evidence supporting the conclusion, and by seizing upon minutiae, sometimes incorrectly.

Defendant contends:

Substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not totally credible.

### C. Credibility/Pain Analysis

Plaintiff's sole argument is that "the ALJ's credibility/pain evaluation is fatally infirm as he fails to state logical reasons or cite substantial evidence supporting the conclusion, and by seizing upon minutiae, sometimes incorrectly." Defendant contends substantial evidence supports the ALJ's finding that Plaintiff's subjective complaints were not totally credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain,

13

or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated,* See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, *supra* at 594.

The undersigned finds the ALJ complied with the first, threshold step in Craig, finding that Plaintiff had medically determinable impairments that could reasonably be expected to produce some of the symptoms that he alleged. The ALJ was therefore required to go on to the second step in Craig, and evaluate the intensity and persistence of Plaintiff's pain and the extent to which it affected Plaintiff's ability to work. A review of the ALJ's decision shows he did take into account Plaintiff's statements about his pain, Plaintiff's medical history all the way back to 2000, the medical signs, laboratory findings, objective medical evidence, daily activities, descriptions of the pain, and medical treatment Plaintiff took to alleviate his pain.

Most significantly, as the ALJ noted, however, Plaintiff filed his application in January 2005, alleging disability since March 2004. The last records in the transcript before he applied in 2005,

14

~~however are from 2002, as follows:~~

> On May 13, 2002, Dr. Weinstein wrote:
>
>> The patient is gradually improving with physical therapy. I will evaluate him again in another two months. Hopefully, he will continue to improve and perhaps consider returning to work.

(R. 184).

> On July 29, 2002, Dr. Weinstein wrote:
>
>> The patient is gradually improving. I think in due course he should be able to return to work. But, right, now, he continues to rehabilitate himself.

(R. 183).

> On November 14, 2002, Dr. Weinstein wrote:
>
>> At this time the patient has some modest residual symptoms and I am recommending that he be evaluated for a permanent partial disability.

(R. 182). This is the last record in the transcript until March 2005, when Plaintiff first saw PA Fitzwater for complaints of fluctuating sugar levels and back pain <u>for three weeks</u>.[1] (Emphasis added). Yet Plaintiff filed his application on January 19, 2005, alleging his conditions caused him to stop working in March 2004, a full year before he saw PA Fitzwater.

The undersigned finds these reports of back pain for a mere few weeks are totally inconsistent with Plaintiff's alleging disability for more than a year, certainly undermining his credibility. Further, years before his application, his treating physician found him getting better, not worse, and opined he would be able to go to work soon.

Again, in June 2005, Plaintiff told Dr. Comerci that he had had back pain ever since his

---

[1] With the exception of an October 13, 2004, shoulder x-ray which showed no evidence of fracture, and normal bones, joints and soft tissue (R. 172).

15

injury, "~~and worse over the past three weeks~~." (Emphasis added). Upon examination, Plaintiff's straight leg raising was negative in the seated position and positive in the supine position, but at 60 degrees.

In November 2005, Plaintiff complained to Dr. Davis of increased stabbing and burning pain starting three months earlier, in the right lower back radiating down the back of his leg. The radiating pain was intermittent and aggravated by activity. (Emphasis added). Again, this report is totally inconsistent with a claim of disabling back pain since March 2004, and clearly undermines Plaintiff's credibility. In fact, Dr. Davis stated that Plaintiff could not continue working at his job while undergoing treatment, but he could return to light duty with no prolonged standing or sitting, and no bending, squatting or lifting. (Emphasis added). Notably, Plaintiff had not worked at any job, and alleged he was disabled from all work since March 2004.

State agency physician Dr. Porfirio opined: "Some of his allegations are not supported by medical evidence therefore he is only partially credible."

In December 2005, State agency physician Osborne also found Plaintiff's complaints only partially credible.

The undersigned finds the evidence of record itself substantially supports the ALJ's determination that Plaintiff's statements concerning the intensity, duration and limiting effects of his impairments are not entirely credible.

Plaintiff argues, however: "The Court has an overriding duty to ensure that the inferences and conclusions drawn [by the Commissioner] are rational and logical and that there is a sound foundation for the Commissioner's findings." (Plaintiff's brief at 9). Plaintiff then argues that the ALJ's evaluation is totally inadequate, in that he cites scant substantive facts and some of the facts

~~he does cite are not logical.~~

The Court agrees with Plaintiff that many of the ALJ's stated reasons for his negative credibility finding are incorrect or illogical, as Plaintiff argues. The question, however, is whether the inclusion of such incorrect, illogical findings detracts from the substantial evidence the Court has already found supports the finding, to the extent that there is no longer substantial evidence supporting the determination itself. The undersigned finds it does not. Although it is unfortunate that the ALJ included unnecessary, conclusory, even illogical statements in his credibility determination, the undersigned finds the ultimate determination is nevertheless supported by substantial evidence.

In addition to finding substantial evidence supports the ALJ's finding that Plaintiff was not entirely credible, the undersigned also finds substantial evidence supports the ALJ's ultimate determination that Plaintiff was not disabled from his alleged onset date in March 2004, through the date of the ALJ's decision. Even Dr. Davis, Plaintiff's own physician, found that Plaintiff could return to light duty with no prolonged standing or sitting, and no bending, squatting or lifting.

Further, despite finding Plaintiff not entirely credible regarding his pain and limitations, the ALJ still significantly reduced his RFC, limiting Plaintiff to a light exertional level, with no lifting of more than 10 pounds with the dominant (right) hand; no overhead work with the right hand; affording an opportunity for brief changes of position at least every half hour; entailing no exposure to significant workplace hazards; requiring no more than occasional balancing, crawling, crouching, kneeling or stooping; entailing no concentrated exposure to extremes of humidity, temperature of respiratory irritants; and accommodating up to one unscheduled workday absence per month.

The undersigned finds substantial evidence supports the ALJ's RFC determination.

## V. RECOMMENDATION

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff was not under a disability at any time through the date of his decision. I accordingly recommend Plaintiff's Motion for Motion for Summary Judgment [Docket Entry 13] be **DENIED**, Defendant's Motion for Summary Judgment [Docket Entry 16] be **GRANTED**, and this case be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 26 day of November, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE